I wonder if both counsel would rise for just a second. I believe we had in force a motion to close the courtroom. In light of the strong policy in favor of the openness of all judicial processes, you were quite reluctant to do so. Is there something that compels it in this case? Your Honor, from the panel's perspective, we're very comfortable arguing the case based on the public record, and we believe that the solicitation's terms are critical here. And therefore, while we are deferred to the court's judgment, we see no compelling reason to close the proceedings. The government sees no compelling reason to close the proceedings. Thank you. Let's proceed then. I think we have a third. Your Honor, we can argue based on the public record. Our concern, in part, was the need to the court during the argument. If you have questions that we would need to defer to the protective parts of the record in order to answer, that would be a good thing. You can inform us if there's something that is compelling that needs to be protected, and we'll respond at that time. So let's proceed. Mr. Hazleton? May it please the court, my name is David Hazleton. I'm joined by my colleague, Kyle Jefko, at the counsel's table. Mr. Jefko was instrumental in preparing the briefs in this case. I believe those briefs were very clear in explaining our position here. We believe that the solicitation issued by the Air Force in this case clearly required a field evaluation to be conducted in a particular manner, and the Air Force failed to conduct that evaluation as expressly and unambiguously mandated by the solicitation document. In doing so, it violated both statute regulation and well-established body of law, requiring the agency to evaluate proposals strictly in accordance with the terms of the solicitation. I'd be pleased to answer any questions the court has. What I'd like to do, please the court, is to focus initially on the portion of the solicitation that specifically addresses how the evaluation is to be conducted. In the joint appendix at page 20031 and 22, there is a section entitled, specifically entitled, Evaluation Basis for Award. And then there is 020031 and 32. If it pleases the court, I did have copies made of the sections that I anticipate referring to, and I would be pleased to make them available to the court to avoid shuffling the paper. And before the court are the provisions that I'll be addressing. And you'll see that they're listed in the first three pages when copies of the relevant pages from the joint appendix are set forth as attachments here, too. The specific provision in the solicitation prescribing how proposals were to be evaluated for award  in accordance with the terms of the joint appendix. The award is to make the responsible offeror whose proposal continues to conform to all the solicitation requirements. And then later on, this provision meets all the requirements set forth in the RFP. Immediately following that, in section 2A, once again, within the section discussing the evaluation basis for award, the solicitation identifies the specific evaluation factors and sub-factors to be used in making that award decision. The specific provision on which we have focused in our briefs is that provision that's set forth in section 2A regarding the field evaluation. And it explains that this sub-factor is met. And it continues on with the offer provides material required. And then very specifically, the two submitted SCBA units meet or exceed in a way beneficial to the government all the performance evaluation areas listed in the field assessment questionnaire. To respect, we'll submit that that language is clear and unambiguous. The offeror must meet all. It doesn't say some. It doesn't say selected. It says all the performance evaluation areas listed in the field assessment questionnaire. In that field assessment questionnaire, which is also referenced and attached in the materials I've provided, you'll see that there are 28 separate performance evaluation areas. The record is uncontroverted that the Air Force in its evaluation process elected not to utilize at least eight of those. And it did so by either leaving blank or putting N and A in the evaluation worksheets. I'd also further note that at no time has MSA argued that it in fact could meet all 28 of those evaluation factors, excuse me, performance evaluation areas. From our perspective, that can end the analysis of the court. The RFP says plainly you must meet all performance evaluation areas. The Air Force failed to conduct an evaluation looking at all the performance evaluation areas. And it's uncontested by MSA that they make no contention that they could meet all the performance evaluation areas. They instead focus on a separate provision, which is in the proposal requirements section of the solicitation, section 3D1. And in their briefs, both the Air Force and MSA focus on the reference to the base unit that was to be provided for the field evaluation. They argue that that base unit was all that was required. And that base unit was incapable of meeting all the performance evaluation areas that are set forth in the questionnaire. And in particular, they focus on the requirement to, they're noted here, attaching a PAPR. And let me take a moment to step back. An issue in this procurement is a self-contained breathing apparatus, an SCEA. There is a remarkable new development that is marketed by our client, which allows the shift from the oxygen tank that the wearer would normally use when in a contaminated environment, and because of the limited capacity of that oxygen tank, can switch over to something called an APR, the Air Purifying Respirator, or the PAPR, the Power Air Purifying Respirator, which allows the wearer to maintain activity in the contaminated area for a much extended period of time. That PAPR, which is one of the specifications prescribed in the field assessment questionnaire, one of the performance evaluation areas, they contend would not be part of the base unit, and therefore, the performance evaluation areas didn't really mean what the RFP said they meant. In reality, when we read the section that they cite, it, in fact, fully supports Interspiro's position in this appeal. You'll note in the bolded language that, in fact, it's not just the base unit which is to be provided. We also provide, during the field evaluation, all the accessories that are used with the unit. All of the accessories that are used with the unit. And in a series of questions and answers that were published by the Air Force on the Federal Business Opportunities website regarding this procurement, they make very clear that the accessories include the PAPR. In one instance, they say accessory is any component, not part of the traditional basic SCBA. So yes, the PAPR has been referred to as an accessory within the PD. The PD is a purchase description, which is part of the RFP, part of the solicitation. But it's not the whole RFP. It's a subset of the entire RFP. That's correct. They say it's an accessory within the PD. It's a matter of construction. That doesn't necessarily make it an accessory for the purpose of the entire RFP. In this particular instance, in the first question answer, that may be the case. We turn to the next direction, where an offeror posed a question, is the PAPR considered an accessory? The answer comes back simply, yes, without any such limitation to the PD portion of the RFP. And then you'll see the other reference that we have here. So the first response made by APALE in this case is that we shouldn't take seriously the RFP's specific mandate that we must meet or exceed all of the performance evaluation areas because they contend if you take that position, you would require to submit a PAPR with your proposal. And indeed, that's right. The RFP does require that you submit accessories that specifically include PAPR. And it is because of their misunderstanding or misapplication that the Air Force made an incorrect evaluation, and MSA is ineligible for award because it couldn't do that. Another argument that they make is that there's a difference between the pre-award evaluation and the post-award evaluation of the units submitted. And in that context, if we look again at the specific provision on which we started our analysis, the evaluation basis for award, it's talking about what you have to do in the pre-award evaluation. It refers to offerors. It's talking about what will be done for award. It doesn't say what the contractor will do later. The government, MSA would argue, in effect, that you do not have to meet all the performance evaluation areas now, but later, months, indeed, potentially years down the pipe, when you deliver, then you have to meet it. But that's not what the RFP says. Indeed, it's not simply clear just based on the section of evaluation basis for award, but when we look at the solicitation's purchase description, and this is item 6 on the list of provisions on page 2, it has a section as well entitled pre-award evaluation, and it explains that also included in the pre-award evaluation activity will be the requirement for offerors to submit STBAs for field evaluation exercise training, which will be conducted by the government, and it refers to Appendix A. Appendix A says specifically that the STBA and accessories, which were specifically defined by the Air Force to include the PAPR, shall be worn to conduct field exercises in simulated battlefield conditions and scenarios. There's, in fact, a separate provision in the PD of the RFP that talks about post-award testing, and it does include other requirements. Finally, the government and MSA focus on the provision in a question and answer that isn't part of the RFP, and it's the one referenced in item 8. And if you look, though, at the question and answer, it doesn't have the meaning that they suppose. Reading from the fourth line of that Q&A, the question continues, 3.4.6, which is a reference to a part of the PD, requires that the unit be NIOSH certified. Paragraph 3.4.6 implies that these units include NBC, nuclear biological chemical, APR mode. Does the government require that these units include the APR and PAPR modes, or is the government's intent that the two STBA must be NIOSH CBRM certified? The response is simply that APR and PAPR modes are not required, and our understanding of this, and you'll see why, is that they're saying it's not required to be NIOSH certified. It's not saying that the APR and PAPR aren't required to be field-tested. Let me finish one point, and then I will, Your Honor. When you look at that section of the RFP, section 3.4.6 of the person's description, it explains just what I explained. It says the NIOSH compressed air system, that is the base unit, shall be tested and certified by NIOSH. It then continues, though, to say the chemical warfare component, which the APR and PAPR is explained here, does not have to meet that protocol. So the question answered on which they're reliant does not say what they suspect, what they suggest, and in fact is simply saying that the APR and PAPR do not have to be NIOSH certified, and that's specifically what that person's description citation, 3.4.6, that's referenced here, provides. Just a very quick question. Yes. On 202.403, section 11, that you referred us to as referring to considered an accessory, APR considered an accessory, there's a reference immediately before that that says section 3.4.5. Is that part of the PD? Is that part of the PD? Yes, it is, Your Honor. Your Honor, for all the reasons I've discussed, we submit that the Air Force failed to evaluate proposals in accordance with the solicitations expressed in unambiguous terms. If it had evaluated the proposals properly, my client in a spiral would have been awarded the contract because it, in fact, could meet all the performance evaluation errors, and MSA would not. And based on that fundamental proposition of procurement law, we respectfully request that the Court grant the appeal of instructions that the court apply to the Court of Appeal. Thank you. Mr. Hazleton and Mr. Macklemore. Thank you, Your Honor. Good morning, good afternoon, and may it please the Court. Mr. Hazleton and Ms. Spiral still do not respond to the argument that we made in our brief that their interpretation of the RFP would read out of it what appears on 2-000-28 part of the performance requirements that Mr. Hazleton talked about, but we argue that it would read out of the RFP both subfactor 3 and in particular the paragraph A of subfactor 3, which tells the offeror to explain to the Air Force how it plans to integrate the following into its existing commercial SBA unit, which is, the paragraph also says, the one you told us about in subfactor 2, the one you're going to give us for field evaluation in subfactor 2. Well, A, paragraph A, is the estimated weight of the power. So as we said in our brief, there would be no point to telling them, the Air Force would tell us how they were going to integrate a PAPR into its existing commercial SCBA unit if the existing SCBA unit, existing commercial SCBA unit, and I use those words carefully, are the ones that have PAPRs altogether. Also, it doesn't take into account what appears in the first almost, the very first line of the purchase description on A-2-000-38 where the Air Force tells offerors that it's looking for the next generation SCBA. They're not looking for things that are on the market now. They're looking for the next generation SCBA that has all these capabilities and if one goes to page 2-000-43, especially it has this capability that the wearer, in paragraph 3.1 of the PD, in the middle of the paragraph, the wearer shall not be exposed to inhalation, absorption, or ingestion contamination when transitioning throughout those modes. Now, regardless of whether into spiral things that it had on the market, something that meant that PD, the Air Force didn't agree. The Air Force, after conducting its market research, put out this RFP that told the offerors, tell us what you have and we're going to field test the SCBA, what we understand to be existing commercial SCBA units, and then tell us how you're going to move from that core basic SCBA unit to what we have told you in the purchase description. And it is important that in those questions and answers that refer to accessories that the references are to the PD because this is what they're supposed to tell us how they're going to move into. Tell us how you're going to move from the SCBA unit to what we're asking for in the PD. Well, the reference to 11 is to the PD only if you incorporate the 3.4.5, which immediately precedes the question and answer, correct? Yes, and there are other questions that also refer to the PD. Right. I know there are, but that one in itself just says, is it an accessory? But the argument that I would assume you'd be making based on that is that when it says 3.4.5, it's referring to the PD. Yes, and this all has to be taken in harmony and in context to make sense of it all. It could have been made clearer, but that's always true. That's always true. But InterSpiral also doesn't make any effort to address what MSA pointed out on pages 32 and 33 of its brief regarding what InterSpiral understood, and I won't get into the proposal because that's confidential, but these are page references to the InterSpiral's proposal where they use the term existing SCBA, existing commercial SCBA unit, that explain what they understood, and I'll stay away from explaining what they understood, but what they understood to be an existing commercial SCBA unit when they submitted their proposal. They also want the court to pay attention to the question and answer on whether PEPAs are accessories, but apparently not about whether the— they don't want the court to look at that question— take into account that question 7, which is on page 202409, in which the government answers the question, does the government—and this is talking about subfactor 2. This isn't talking about the PD now. Does the government require that these units include the APRA and PEPA modes? Well, the answer to that, reasonably read, is no. Don't give us—don't worry about giving us your—any APRA or PEPA mode SCBAs. Just give us your commercially available—your existing commercial SCBA unit, which we understand to be just the SCBA because that's all we're going to be testing. And this—in their brief, they make an effort to walk away from the import of that answer, but on pages 300235 and 236 is one of their briefs to the Court of Federal Claims where they make a point of how important the Air Force answers to the vendors' questions were. They say—it's both 300236, 235 and 236, but now I'm reading from 236 at the very top. The Air Force answers to vendor questions, as published on the FBO website, are therefore necessary for a proper understanding of both the RFP's requirements and then just as far as proposals go. We agree. That is—they never actually say that they didn't have notice of what the Air Force answered in response to that question, and this at least suggests, and in the light best of our argument, shows that they did understand what the Air Force was talking about and they relied upon it. And it's not enough that the Air Force didn't amend the solicitation to include those answers. In fact, in the mail-loading case to which they cite in their brief, there's a discussion about the force of the answers given to the government. Now, in that case, the government apparently was trying to walk away from the answers that it gave at a pre-bidding conference, and the court has stopped it from doing that and held it to its answers. Well, what's good for the goose is good for the gander, and if the answers to questions like this are to have any force, and they do in the patent ambiguity context, then an offeror is on notice of what is posted on the FBO website, particularly if they don't make a case that they didn't look at the website in the first place. On risk, there was discussion in their brief about risk, but they only rely on that page 200660, which is MSA's risk matrix. But they don't make any effort to debunk how MSA said it would work around the risks that MSA itself said it would do. You had this time. I had that time. Thank you. And they also don't disprove or in any way, in a technical sense, disprove what the Air Force regarded as the risks actually posed by MSA's proposal, which are reflected on pages 201, 491, and 492, the final technical evaluation. So it's not enough for them to just say the Air Force didn't talk about every single thing, and the Air Force did address some of the things that were on that risk matrix. Finally, the issue of Judge Firestone's denial of their motion to supplement the record in some respects is not one the court should accept, and that's because even though Judge Firestone didn't explain why those documents were excluded, that's not enough, and we make this point. We don't cite your authority on it, but on page 33, we make the point that Interspiro has utterly failed to demonstrate how such documents could have affected the outcome of its bid protest, and that should be their requirement because this is an evidentiary ruling.  And authority for the proposition that they'd have to show a prejudicial error or else an error like that is harmless is Air Land Forge 172, Fed Third, at 1341, this court's 1999 opinion. Thank you, Your Honor. Thank you, Your Honor. Mr. Humphrey, you have five minutes. Thank you, Your Honor. I'm Tom Humphrey representing the awardee in this case, Mine Safety Appliances Company. If I could go back to the fundamental aspect of this case, Mr. Hazelson started off talking about how the proposals were going to be evaluated. The court, with all due respect, needs to focus first on what was supposed to be in that proposal. The agency can only evaluate what's in the proposal. If you refer to the proposal requirements for factor two, which are on page 28 of the record, the agency made clear that what was to be field tested was the commercially available unit that had been certified. And the court below keyed in on exactly those two things, that what was to be field tested had to be commercially available and had to be certified. The agency clearly says on page 28, we will not field test units that are not certified. And if you go then to the evaluation factor that Mr. Hazelson referred to, it says something to the effect that this factor will be met when the proposal requirements of factor two, when that material is provided. So unless someone can show, and the court below found there were no such things, that there are commercially available certified units that meet all of the performance areas in this questionnaire, the agency had set up an impossibility. And Mr. Hazelson would have you infer from the evaluation factor to change what the agency made perfectly clear was supposed to be proposed. And in fact, that interpretation of what was supposed to be field tested was consistent. The agency has always taken that position. MSA has always taken that position. Scott, the other protester below, in fact, founded a protest ground on the proposition that if the agency had tested or evaluated anything other than the commercially available certified SCBA units, it violated the RFP. And the agency defended on the grounds, no, we just defended, we just evaluated the commercially available certified SCBA units. And the court found that, in fact, the agency had properly followed the RFP in that respect. So the performance questionnaire does include certain evaluation areas. There are very few, as we pointed out in our brief. And in our view, it's a much more reasonable interpretation to say that what's clear in this RFP is what was supposed to be field tested, what the agency said would field test, and then read the application of the questionnaire with respect to the proposals that were, in fact, submitted. Now, the other factor is that Mr. Hazleton claims that we don't have a unit that would comply. The fact is, we do. But the point is that we weren't supposed to submit that unit with this proposal. And, in fact, Mr. Hazleton's client, in our view, did not submit, and you can read the court's findings below with respect to what Mr. Hazleton's client submitted over and above, its commercially available certified SCBA unit, its commercially available certified unit. And it's clear that those would not meet the requirements of being commercially available and certified. So the question becomes, how do you apply an evaluation factor or a few elements of an evaluation factor to a field test where the field test was never intended to look at those two few elements, if you look at our brief. And it's much more reasonable to say, well, the language in the evaluation factor should be read to say that we'll apply, you should meet the areas that apply to what's been proposed. It's also clear that... Thank you, Mr. Humphrey. I think our time is up. Thank you, Your Honor. Mr. Hazleton, you have no more than a minute. Thank you. First and foremost, again, the specific RFP provisions in the evaluation section, which is what the agency was supposed to do and how to evaluate, says clearly you have to meet all the performance evaluation areas. Counsel, they also say that it's going to be a commercial unit, and that's what we tested. Your Honor, when you look, counsel for MSA and the Air Force, I believe they've mischaracterized dramatically what is stated in the RFP under proposal submission. Again, turning to page 200028, it does talk about the base unit. And if you read the Air Force's brief, they talk about that base unit needs to be certified. But they have ignored that it goes on to say, and if you look at the last three lines of the very section, and under proposal submission, field evaluation, paragraph A on which statements rely, it says that they're to include, quote, all the accessories that are used with the unit. And they say plainly, the Air Force said plainly in its directions to offerors, that accessories includes the APRA and PAPRA. Your Honor, further, they talk about, they said there's something about NIOSH certification here. You can study this section up and down. It has nothing about NIOSH certification. That's in the PD section. It's addressed elsewhere that I discussed where it says NIOSH certification is required for the base unit, the oxygen tank, but not for the APRA and PAPRA. Thank you, Your Honor. All rise. The audible court is adjourned until tomorrow morning at 10 o'clock a.m. Thank you.